**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

In re: Hotel Industry Sex Trafficking              MDL Docket No. _____
Litigation

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
TRANSFER OF ACTIONS TO THE SOUTHERN DISTRICT OF OHIO (EASTERN
DIVISION) PURSUANT TO 28 U.S.C. § 1407 FOR CONSOLIDATED PRETRIAL
PROCEEDINGS**

**INTRODUCTION**

Movants in seven (7) civil actions pending in five (5) different United States District

Courts, Exhibit "1" (collectively, "Plaintiffs"), submit this Memorandum of Law in support of

their Motion to Transfer ("Motion") and centralize all currently filed cases listed in the attached

Schedule of Actions, Exhibit "2" (collectively, "Actions"), as well as any subsequently filed cases

involving common questions of fact ("tag-along actions")[1], for coordinated or consolidated pretrial

proceedings before the Honorable Algenon L. Marbley, Chief Judge in the United States District

Court for the Southern District of Ohio, Eastern Division, pursuant to 28 U.S.C. § 1407 and Rule

6.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation.  For the reasons set

forth in Plaintiffs' Motion and as explained in detail below, transfer and centralization of the

Actions is warranted, and Plaintiffs respectfully request an order be entered by the Judicial Panel

on Multidistrict Litigation ("Panel") consolidating and coordinating the Actions, as well as any

---

[1] In addition to Movants, there are fourteen (14) additional civil actions pending in seven (7) additional United States District Courts. Therefore, there are a total of twenty-one (21) civil actions pending in twelve (12) different United States District Courts in the Schedule of Actions. Through discussions with law firms around the country, movants have learned that there are approximately 1,500 sex trafficking victims who have retained lawyers to investigate and evaluate their claims against the hotel industry.

1

future tag-along actions, to the United States District Court for the Southern District of Ohio before Judge Marbley.

## BACKGROUND

### A.  Sex Trafficking in the Hotel Industry

"The private pain and public costs imposed by human trafficking are beyond contention, and motels provide an obvious haven for those who trade human misery." *City of Los Angeles, Calif v. Patel*, 135 S. Ct. 257, 2461 (2015) (Scalia, J., dissenting, joined by Roberts, C.J. and Thomas, J.).  Today, sex slavery is pervasive in the United States, and hotels are the primary venue.[2]  In each of the currently pending Actions, the victims were repeatedly trafficked *at the named Defendants' hotels*.  Sometimes, victims were trafficked at one hotel; sometimes, victims were trafficked at many of them.

The trade in human misery is big business, with human trafficking estimated to generate $150 billion per year in profits.[3]  The vast majority of human trafficking for commercial sex occurs within the hotel industry and, as a result, Brand hotels should be the first line of defense against this ongoing epidemic.[4]  For years, sex trafficking ventures have brazenly and openly operated out of hotels throughout this country, and those trafficking ventures have "been able to reap these profits with little risk when attempting to operate within hotels."[5]

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (last viewed November 25, 2019) citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[3] Bradley Myles, *Combating Human Trafficking in the Hotel Industry,* Huffington Post, July 22, 2015, at https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last viewed November 25, 2019); *See* Galucci, , *supra*.

[4] *See Human Trafficking in the Hotel Industry,* Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry (last viewed November 25, 2019); s*ee also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post, June 2016, at http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victims-life_us_57714091e4b0f168323a1ed7 (last viewed November 25, 2019).

[5] *See* Myles *supra* note 1.

The epidemic is well documented.  In 2018 alone, 3,218 individual victims of human trafficking reached out to the Polaris Project's National Human Trafficking Hotline.[6]  Moreover, since 2007, the National Hotline has handled 51,919 calls, accounting for a total 23,078 victims identified.[7]  The amount of sex trafficking occurring within the hotel industry is truly astounding. Attorneys for the hotel industry estimate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[8]  In 2014, ninety-two percent (92%) of the calls the National Human Trafficking Hotline received involved reports of sex trafficking taking place at hotels.[9]  Hotels have been found to account for over ninety percent (90%) of commercial exploitation of children.[10] For the past decade, Brand hotels could have easily taken a united stand to stop sex trafficking at their properties, as the hotel industry is dominated by a small number of corporations, with the top 6 companies owning over 90% of hotel properties, as identified in the graph annexed to the instant Memorandum of Law as Plaintiffs' Exhibit "3".[11]

Despite the fact that Defendants could have initiated and accomplished industry-wide changes more than a decade ago to prevent human trafficking, such changes would have directly cut into and reduced their profits once traffickers and sex trafficking victims ceased renting their hotel rooms.  Human traffickers have capitalized on the hospitality industry's refusal to adopt and implement industry-wide standards and anti-trafficking policies and procedures, including, but not

---

[6]  2018 Statistics from the National Human Trafficking Hotline, Polaris Project, 2018, at https://polarisproject.org/sites/default/files/Polaris_National_Hotline_2018_Statistics_Fact_Sheet.pdf (last viewed November 25, 2019).
[7] *Id.*
[8] Rich Keating, *Human Trafficking: What is it and how it impacts the Hotel Industry*, AHIA Sprint Conference 2013, *available at* http://ahiaattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last viewed November 25, 2019).
[9] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report, October 2015, at https://scholarship.sha.cornell.edu/cgi/vi_ewcontent.cgi?article=1222&context=chrpubs Oct. 2015 (last viewed November 25, 2019).
[10] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).
[11] *See* Exhibit "3".

limited to, training hotel staff on how to identify obvious and well-known signs of sex trafficking. There is no dispute that room rentals drive the profits of hotels, not other amenities such as food and drink purchases, spa services, restaurants and other in-room entertainment services.[12]  "In short, as the rooms department goes, so goes the hotel."[13]  At limited service hotels and extended stay hotels, room rentals alone account for ninety-seven percent (97%) of the total revenue of the hotel and the average ratio of full service and limited service hotels is equally significant at sixty-eight percent (68%).[14]  Thus, Brand hotels derive the overwhelming majority of their revenue from room rentals.

Only recently, to some extent only after the first lawsuits were filed, has the industry begun to take some of the steps they could, and should, have taken 20 years ago and even these changes do not seem to be true enforcement of zero tolerance.  A partner who is the hospitality group Co-Chair at a major corporate law firm recently stated: "In this climate of sexual assault and the #MeToo movement, it's (sex trafficking) on the minds of everyone I talk to in the hospitality industry because nobody wants to be known as the hotel where trafficking occurs."[15]  This insider's view tells us, unsurprisingly, that it is brand reputation, not statutory and common law duties, let alone moral duty, that is finally compelling the industry to stop looking the other way and stop taking the money after years of remaining dormant.  One profit motive has superseded the other and so some action is happening, but far too late for thousands of destroyed children, teenagers and young adults.

---

[12] Robert Mandelbaum, *Rooms Department Operations*, Hospitality Net, Mar. 23, 2007, *available at* https://www.hospitalitynet.org/opinion/4030758.html (last viewed November 25, 2019).
[13] *Id.*
[14] *Id.*
[15] https://www.fastcompany.com/40510138/hotels-are-key-in-the-fight-to-end-human-trafficking (last viewed November 25, 2019).

**B. Lawsuits Brought on Behalf of Plaintiffs Against the Hotels**

Plaintiffs have brought claims against culpable corporations dominating the hotel industry (collectively, "Defendants") under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 US.C. § 1595(a), as well as similar state statutes and common law. These corporations control every major aspect of the hotels that bear their name and those running these corporations have been fully aware of the sick and pervasive sex trafficking in their hotels.

Plaintiffs are surviving victims.[16] Plaintiffs were trafficked at multiple different hotel locations. At each location, Plaintiffs showed the obvious and well-known signs of being trafficked for sex. Nevertheless, Plaintiffs were still sold on the commercial sex market at Defendants' hotels. Each Plaintiff was repeatedly coerced, usually by violent force, to engage in sex acts. Accordingly, all but one Plaintiff has sued multiple Defendants. Given the nature of trafficking ventures, and the relatively small number of controlling companies within the hotel industries, Plaintiffs have brought claims against the same or many of the same Defendants. Moreover, the number of individual Plaintiffs currently represented but not filed (approximately 1500) means that more cases will be filed causing additional overlap of the Defendants. As the cases are filed, a large number will have the very same set of defendants and there will be extensive overlap of one or more defendants. For these reasons, Plaintiffs have styled this Multi-District Litigation ("MDL") as *In Re: Hotel Industry Sex Trafficking Litigation*.

Plaintiffs allege that the Defendants violated the TVPRA by renting rooms to individuals it knew, or should have known, were engaged in sex trafficking. Furthermore, Defendants intentionally or negligently engaged in acts and omissions that supported, facilitated, harbored,

---

[16] Although hundreds and probably thousands of victims trafficked at hotels have died from disease, homicide, drug addiction and suicide, very few on these deceased victims' behalf have yet to come forward.

and otherwise furthered the trafficker's sale and victimization of the Plaintiffs for commercial sexual exploitation.

The TVPRA prohibits Defendants from engaging in any venture they know, or should have known, involved trafficking.  And, Defendants have a non-delegable duty, under the TVPRA, to avoid participation in what they know, or should have known, involves a trafficking venture.  As such, the TVPRA requires the Defendants to implement policies sufficient to identify and prevent participation in trafficking ventures.

While Defendants advertise to consumers that they have taken steps to prevent human trafficking, these policies have not been fully implemented, and, in some instances, not implemented at all.  Defendants failed develop training to prevent human trafficking, failed to implement training to prevent human trafficking, and failed to conduct audits to confirm both that training has been implemented and human trafficking is being prevented on hotel properties. Defendants further failed to enact robust policies and practices to ensure continuous, directed action to combating human trafficking.  For instance, the Defendants failed to post information listing the numerous red flag indicators of trafficking present throughout the related cases in the Schedule of Actions.[17]  The Defendants also failed to safeguard and monitor technology on their premises, including internet and VPN activity, thereby often allowing traffickers to facilitate and engage in the commercial sex trade with the Defendants' technology.

Cases against the Defendants are pending in federal courts from coast to coast.  The effects of trafficking are wide-spread evidence and facts establishing how this happened and who is to blame which are, in significant part, uniform.  Consolidation in a multidistrict litigation proceeding

---

[17] *See Addressing Human Trafficking in the Hotel Industry*, Green Hotelier, July 2013, *available at* http://www.greenhotelier.org/know-how-guides/addressing-human-trafficking-in-the-hotel-industry/ July 2013 (last viewed November 25, 2019).

will unquestionably prevent inconsistent rulings and to allow efficient and coordinated adjudication of the burgeoning number of cases brought on behalf of what were the most powerless people in our society. Granting this MDL against these Defendants will provide victims access to a single and fully informed judge and a justice system where they otherwise may not have had the courage or ability to move forward.

### C. The Location and Status of Human Trafficking Lawsuits Pending Against Defendants

As explained above, the Actions for which Plaintiffs seek centralization all involve claims brought on behalf of Plaintiffs against Defendants in the hotel industry. These cases have been filed in various U.S. District Courts all over the country. The attached Schedule of Actions lists all known related actions, with corresponding docket sheets and complaints attached as Exhibits 4-24. No activity in any of these cases is so significant that transfer would impede progression of the cases. Chief Judge Algenon L. Marbley in the Southern District of Ohio, however, has the most cases and is leading with respect to moving these cases forward. Indeed, Chief Judge Marbley expended considerable time and judicial resources to advance human trafficking matters.

Of the six cases before Chief Judge Marbley, *M.A. v. Wyndham Hotels & Resorts, et al.,* Case No 2:19-cv-849 has become the unofficial lead case. In that case, the Court held a preliminary pretrial conference, and issued a pretrial scheduling order requiring discovery in the related cases to proceed along the same tract. Importantly, Chief Judge Marbley ruled on motions to dismiss, and discovery is underway. Plaintiff has served written discovery and requests for production. Plaintiff has also noticed Rule 30(b)(6) depositions. Currently, the parties are in the process of negotiating key case management orders. In order to facilitate this process, the Court has held multiple telephonic conferences with the parties. Said another way, the case is being

actively litigated, and has made substantial progress, under the supervision of Chief Judge Marbley.

## ARGUMENT

### A. Centralization of Related Actions Against Defendants Is Statutorily Warranted

The purpose of centralization in a multidistrict litigation ("MDL") is to "prevent inconsistent rulings … and overlapping pretrial obligations, reduce costs, and create efficiencies for the parties, courts and witnesses." *In re Kerydin (Tavaborole) Topical Solution 5% Patent Litigation*, 366 F. Supp. 3d 1370, 1371 (J.P.M.L. 2019).  Transfer of related actions to a single district for pretrial proceedings "eliminate[s] duplicative discovery; prevent[s] inconsistent pretrial rulings; and conserve[s] the resources of the parties, their counsel, and the judiciary." *In re Ethicon Physiomesh Flexible Composite Hernia Mesh Products Liability Litigation*, 254 F. Supp. 3d 1381, 1382 (J.P.M.L. 2017).

Accordingly, pursuant to 28 U.S.C. § 1407, transfer of actions to one district for coordinated or consolidated pretrial proceedings is appropriate where: (1) actions pending in different districts involve one or more common questions of fact, and (2) the transfer of such actions will be for the convenience of the parties and witnesses and will promote the just and efficient conduct of such actions. 28 U.S.C. § 1407(a).  Consolidation is especially important in multidistrict litigations where "the potential for conflicting, disorderly, chaotic" action is greatest. *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968).

The cases meet the statutory requisites for the Panel's determination that centralization is warranted.  In summary, the cases should be transferred because: (1) various actions are pending in different federal judicial districts throughout the U.S.; (2) the various actions share common factual questions as cases brought on behalf of Plaintiffs against the hotel industry; and (3) transfer

8

and consolidation will be convenient overall, will promote litigation efficiencies, and will conserve judicial, party, and counsel resources.  Plaintiffs address the separate statutory factors, in turn, below.

### B.  The Related Actions Against the Defendants Share Common Questions of Fact

The related actions against the Defendants share common questions of fact.  Each of the related cases requires adjudication of the standards and duties imposed under the TVPRA as a prerequisite.  Because federal requirements and duties are uniform across the country, consolidation in one court will achieve judicial efficiencies and is necessary to avoid inconsistent rulings regarding Defendants noncompliance with their mandatory, federally-imposed duties. Transfer, coordination, and or consolidation are appropriate because many common questions exist, including, but not limited to the following:

- the nature and extent of sex trafficking within at Defendants' properties and in the hotel industry as a whole;

- whether Defendants violated regulations related to the human trafficking including the TVPRA, 18 US.C. § 1595(a);

- the facts giving rise to Defendants knowledge or constructive knowledge of sex trafficking ventures;

- whether Defendants knew the sex trafficking involved minors;

- what if any steps Defendants took to prevent human trafficking ventures that they knew or should have known occurred on their premises;

- whether Defendants concealed negative information from consumers and or government;

The Panel typically orders transfer and centralization when common factual questions, similar to those here, appear in products liability litigation. *See, e.g., In re: Farxiga (Dapagliflozin) Prods. Liab. Litig.,* 273 F. Supp. 3d 1380, 1382 (J.P.M.L. 2017) ("The actions … implicate numerous common issues concerning the development, manufacture, testing, regulatory history,

promotion, and labeling of the drugs."); *In re: Ethicon Physiomesh Flexible Composite Hernia Mesh Prods. Liab. Litig.,* 254 F. Supp. 3d 1381, 1382 (J.P.M.L. 2017) ("All of the actions share common factual questions arising out of allegations that defects in … Physiomesh … can lead to complications when implanted in patients …");  *In re: Atrium Med. Corp. C-Qur Mesh Prods. Liab. Litig.,* 223 F. Supp. 3d 1355, 1356 (J.P.M.L. 2016) (listing common factual questions like those Plaintiffs note above in litigation involving different hernia mesh devices manufactured by the same Defendant).

Moreover, "transfer does not require a complete identity of parties or factual issues when, as here, the actions arise from a common factual core." *See In re: Eliquis (Apixaban) Prods. Liab. Litig.,* 2017 WL 6569794, at *2 (J.P.M.L. May 30, 2017) (citation omitted); *see also In re: Roundup Prods. Liab. Litig.,* 214 F. Supp. 1346, 1347 (J.P.M.L. 2016) ("[D]ifferences are not an impediment to centralization when common questions of fact are multiple and complex."); *In re: Tylenol (Acetaminophen) Marketing, Sales Practices & Prods. Liab. Litig.,* 936 F. Supp. 2d 1379 (J.P.M.L. 2013) (citation and internal quotation marks omitted) ("As we have previously observed...almost all injury litigation involves questions of causation that are case-  and plaintiff-specific.").  And common questions of fact can exist among multiple defendants where two or more complaints assert comparable allegations against similar defendants based on similar transactions and events. *See, e.g., In re UnumProvident Corp. Sec., Derivative & ERISA Litig.,* 280 F. Supp. 2d 1377, 1379 (J.P.M.L. 2003) (centralization was appropriate where "all actions [could] be expected to focus on a significant number of common events, defendants, and/or witnesses" and "core factual allegations" were consistent among the actions); *In re Japanese Elec. Prods. Antitrust Litig.,* 388 F. Supp. 565, 567 ("Transfer under §1407 is not dependent on a strict identity of issues and parties but rather on the existence of one or more common questions of

fact."). However, "[t]ransfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." *In re Kugel Mesh Hernia Patch Prod. Liab. Litig.*, 493 F. Supp. 2d 1371, 1373 (J.P.M.L. 2007) (emphasis added); *see also, In re Epipen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation*, 2017 WL 3297989, *3 (J.P.M.L. Aug. 3, 2017) ("Unique legal theories and factual allegations in a particular action, though are not significant where all actions arise from a common factual core.").

In fact, the Panel regularly orders centralization of cases that involve industry-wide claims and or claims against competitors and, crucially, what possible claims of confidential competitive disadvantage could the Defendants here hope to protect in a litigation such as this. These are not pharmaceutical companies. Furthermore, there is great cross-over between Defendants in the Actions and that will increase with new filings. Therefore, whether consolidated in an MDL or not, eventually all Defendants will be in cases that ultimately involves each of the other Defendants. There are numerous cases supporting centralization in circumstances similar to the circumstances found here. *See, e.g., In re Immunex Corp. Average Wholesale Price Litig.*, 201 F. Supp. 2d 1378, 1380 (J.P.M.L. 2002) (centralization of claims against all defendants, rather than on a company-by-company basis was appropriate where "common questions of fact concerning whether (either singly or as part of a conspiracy) the pharmaceutical defendants engaged in fraudulent marketing, sales and/or billing schemes"); *In re Janus Mutual Funds Investment Litig.*, 310 F. Supp. 2d 1359 (J.P.M.L. 2004) (consolidated market-wide conduct); *In re Pharmacy Ben. Managers Antitrust Litig.*, 452 F. Supp. 2d 1352 (J.P.M.L. 2006) (centralizing claims against competing pharmacy benefits managers all of whom faced similar claims under the federal antitrust laws and conspiracy allegations); *In re: Checking Account Overdraft Fee Litig.*, 626 F.

Supp. 2d at 1335 (J.P.M.L. 2009) (centralizing claims that "share sufficient factual questions relating to industry-wide bank posting policies and procedures to warrant centralization"); *In re Incretin Mimetics Prods. Liab. Litig.*, 968 F. Supp. 2d 1345 (J.P.M.L 2013) (centralizing actions against competing defendants which manufacturer four similar diabetes drugs that allegedly caused pancreatic cancer because "Plaintiffs in the cases now before us … make highly similar allegations about each of the four drugs"); *In re Androgel Prods. Liab. Litig.*, 24 F. Supp. 3d 1378, 1379 (J.P.M.L. 2014) ("We are typically hesitant to centralize litigation on an industry-wide basis. In these circumstances, however, we think it is the best solution").

Coordination is warranted when, as here, central facts, parties and claims overlap. *In re 100% Grated Parmesan*, 201 F. Supp. 3d 1375, 1378 (J.P.M.L. 2016) (coordination was appropriate where there was an "overlap in the central factual issues, parties, and claims"); *In re Epipen*, 2017 WL 3297989 at *3 ("given the factual overlap, the litigation taken as a whole is unlikely to benefit from excluding Sanifo from the MDL"). Moreover, to the extent that any case presents "unique factual and legal issues, the transferee judge has the discretion to address those issues through the use of appropriate pretrial devices, such as separate tracks for discovery and motion practice." *In re Epipen*, 2017 WL 2397989 at *3. The facts in the related actions against Defendants present numerous common questions, many of them complex. Further, due to that factual and legal commonality, Defendants' defenses are unlikely to differ significantly from case to case.

## C. Centralization and Transfer of the Related Actions Against Defendants Will Serve the Convenience of Parties and Witnesses and Promote Just and Efficient Litigation

The transfer and centralization Plaintiffs seek adheres to the goals of 28 U.S.C. § 1407.

1.  **Efficiency of litigation**

At the outset, coordination, consolidation, and transfer will "promote the just and efficient conduct" of the many related actions against Defendants in the hotel industry.  Due to commonality of facts and legal issues, without consolidation and coordination, a thousand cases or more will propound interrogatories, seek depositions of the same corporate witnesses, request production of the same or similar documents, and engage in expert discovery on the same issues but with far many more and geographically dispersed experts.  The motions to compel and motions for protective orders regarding deposition notices alone, by the hundreds and eventually even thousands, will be a mess across the country and will consume as much time and transaction costs as an entire litigation.  The heavy load of pretrial motion practice would become a virtually unmanageable task for the Parties, and a waste of judicial economy for the courts.  Further, despite common facts and legal questions, conflicting rulings on the issues are a real risk if judges in several different courts are involved.

But, such duplication, redundancy, and conflict will be precluded through transfer and centralization.  As the Panel recently put it in centralizing pretrial proceedings:

> Centralization will eliminate duplicative discovery, prevent inconsistent pretrial rulings on *Daubert* issues and other pretrial matters, and conserve the resources of the parties, their counsel, and the judiciary.

*See In re: Farxiga*, 273 F. Supp. 3d at 1382; *see also, e.g.*, *In re: National Prescription Opiate Litig.*, 290 F. Supp. 3d 1375 (J.P.M.L. 2017) ("[A]llowing the various cases to proceed independently across myriad districts raises a significant risk of inconsistent rulings and inefficient pretrial proceedings."); *In re: Atrium Med. Corp.*, 223 F. Supp. 3d at 1356 ("Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources

of the parties, their counsel, and the judiciary."); *In re: Air Crash over the Southern Indian Ocean, on Mar. 8, 2014*, 190 F. Supp. 3d 1358, 1359 (J.P.M.L. 2016) (same).

### 2. Convenience of parties and witnesses

Centralization and transfer to the Southern District of Ohio also satisfies § 1407's requirement that pretrial proceedings in a single court in a single district foster the convenience of witnesses and parties. To that end, the Panel generally orders centralization when it determines that the other statutory requisites are met. *See, e.g., In re: Eliquis (Apixaban) Prods. Liab. Litig.*, 282 F. Supp. 3d 1354, 2017 WL 490702, at *2 (J.P.M.L. Feb. 7, 2017); *In re: 21st Century Oncology Customer Data Security Breach Litig.*, 214 F. Supp. 3d 1357, 1358 (J.P.M.L. 2016) ("[W]hile it might inconvenience some parties, transfer of a particular action often is necessary to further the expeditious resolution of the litigation taken as a whole."). Centralization is warranted here for the same reasons. The location of the Southern District of Ohio, Eastern Division in Columbus, Ohio affords multiple benefits to Defendants and Plaintiffs. In the interest of brevity, Plaintiffs refer the Panel to the discussion below concerning the merits of that location.

Last, the Defendants maintain corporate headquarters in different states across the country. In matters such as this, the location of Defendants' corporate headquarters plays a minor part in a convenience analysis—and one that is diminishing in significance. *See, e.g.*, *Bartolucci v. 1-800 Contacts, Inc.*, 245 F. Supp. 3d 38, 48 (D. D.C. 2017) (internal quotation marks and citations omitted) (analyzing access to proof under 28 U.S.C. § 1404(a): "While access to proof is still relevant in a motion to transfer inquiry, modern technology has made the location of documents … much less important to a determination of convenience than it once was."); *Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLC*, 240 F. Supp. 3d 848, 853 N.D. Ill. 2016) ("location of

the sources of proof. . . has become less important in recent years because documentary and digital evidence is readily transferable …").

In short, the above factors also support centralization and, more specifically, centralization to a geographically convenient location.  For these reasons, the Panel should grant Plaintiffs' Motion.

### D. The Southern District of Ohio, Columbus Division, Is the Most Appropriate Transferee District

As stated above, Defendants do business throughout the United States from coast to coast and market, distribute, promote, and sell services in all states.  Accordingly, the transfer of these cases against the hotel industry to U.S. District Court for the Southern District of Ohio, Eastern Division is appropriate in part due to its geographically centralized location and its ability to handle a large volume of cases.  Further, Chief Judge Algenon L. Marbley is an excellent candidate for a transferee judge due to the significant amount of work he has performed to advance the instant related cases on his docket, as well as his experience and proven ability to handle large, complex cases.

#### 1.   The Southern District of Ohio's Centralized Location is Geographically Ideal

When related actions are pending in various districts throughout the nation, the Panel considers the geographically central location of a potential transferee district a highly significant factor. *See, e.g.*, *In re Library Editions of Children's Books*, 297 F. Supp. 385, 387 (J.P.M.L. 1968) ("[A]lthough air travel renders both [coasts of the United States – California and New York] readily accessible, there is still something to be said for the convenience of a geographically central forum in coast-to-coast litigation."); *In re: Epipen (Ephinephrine Injection USP) Marketing, Sales Practices & Antitrust Litig.*, 268 F. Supp. 3d 1356, 1359 (J.P.M.L. 2017) (transfer of nationwide litigation to "geographically central forum" of District of Kansas); *In re: Genentech Herceptin*

*(trastuzumab) Marketing & Sales Practices Litig.*, 178 F. Supp. 2d 1374, 1376 (J.P.M.L. 2016) (transfer to Northern District of Oklahoma: "a geographically central forum for this nationwide litigation"); *In re: Fluoroquinolone Prods. Liab. Litig.*, 122 F. Supp. 2d 1378, 1381 (J.P.M.L. 2015) (transfer to District of Minnesota: a "geographically central and convenient forum for this nationwide litigation").

This Panel has found the Southern District of Ohio to be an appropriate forum in several MDL proceedings. *See, e.g., In re: American Honda Motor Co., Inc., CR–V Vibration Mktg. and Sales Practices Litig.*, MDL 2661, 140 F. Supp. 3d 1336, 1337 (J.P.M.L. 2015) ("We select the Southern District of Ohio as the transferee district for this litigation… [i]n addition, a majority of plaintiffs support selection of that district…"); *In re: E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.,* 939 F. Supp. 2d 1374, 1375 (J.P.M.L. 2013) ("The Southern District of Ohio is both accessible and convenient for parties and witnesses.") *In re: Porsche Cars N. Am., Inc.,* 787 F. Supp. 2d 1349, 1349 (J.P.M.L. 2011) ("We have selected the Southern District of Ohio as the transferee district for this litigation, because this district is geographically centrally located for parties and witnesses in this nationwide litigation and has the capacity to manage this MDL."); *In re: Bill of Lading Transmission & Processing Sys. Patent Litig.*, 626 F. Supp. 2d 1341, 1342 (J.P.M.L 2009) ("The Southern District of Ohio will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation."); *In re Vision Serv. Plan Tax Litig.,* 484 F. Supp. 2d 1356, 1357 (J.P.M.L 2007) ("[C]entralization under Section 1407 in the Southern District of Ohio will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation."); *In re: Foundry,* 342 F. Supp. 2d at 1347 ("[T]he Southern District of Ohio will serve the convenience of the parties and witnesses").

**2.   The Southern District of Ohio has the Ability to Handle Large Case Loads**

The Southern District of Ohio has the capacity to handle this MDL.  The District has five District Judges, eight Senior Judges, and nine Magistrate Judges.[18]  The Panel has determined that the district is equipped with the resources that a complex docket is likely to require. *In re: Nat'l Century Fin. Enters., Inc.,* 293 F. Supp. 2d 1375, 1377 (J.P.M.L. 2003).  The Southern District of Ohio provides a well-staffed and top-notch clerks' office with plenty of experience in handling numerous complex cases, including MDLs, in an efficient manner.  Moreover, in recent MDL's, the Southern District has proven itself capable of providing a user-friendly, easily accessible, and state-of-the-art webpage that provides useful information such as attorney contacts and court orders, thereby providing ease of access to information for litigants across the country.[19]

**3.   Chief Judge Marbley's intellect, experience, and case-management skills make him an ideal judge for handling this MDL**

With regard to transferee judge selection, the Panel has determined that it is best to focus on the "transferee judge with the time and experience to steer this litigation on a prudent course and sitting in a district with the capacity to handle this litigation." *In re Motor Fuel Temperature Sales Practices Litig.*, 493 F. Supp. 2d 1365, 1367 (J.P.M.L. 2007).  Furthermore, a particular judge's willingness, ability, and motivation for handling complex litigation is an essential element in venue selection.[20]

Chief Judge Algenon L. Marbley readily satisfies these criteria and is the best choice for transfer and consolidation of this matter.  Chief Judge Marbley is well respected by both sides of

---

[18] http://www.ohsd.uscourts.gov/judges-biographical-sketch (last viewed November 25, 2019).
[19] http://www.ohsd.uscourts.gov/multidistrict-litigation-2433 (last viewed November 25, 2019).
[20] In a 2008 Tulane Law Review article entitled, *A View from the Panel: Part of the Solution*, 82 Tul. L. Rev. 2225, 2240, Judge John G. Heyburn, II emphasized the importance of the transferee judge and stated "[t]he willingness and motivation of a particular judge to handle an MDL docket are ultimately the true keys to whether centralization will benefit the parties and the judicial system." *Id.*

the bench for his intelligence and skills as a trial judge.  Chief Judge Marbley has over 20 years-experience as a trial judge.  He was appointed as Article III Judge by President Bill Clinton in 1997.[21]  Before his judicial appointment, Chief Judge Marbley was a partner at the Vorys law firm, one of the most prestigious defense firms in the state of Ohio.

Chief Judge Marbley regularly sits by assignment on the Sixth Circuit Court of Appeals and the Ninth Circuit Court of Appeals.  He also teaches trial practice at the Ohio State University Moritz College of Law and Harvard Law School.

Chief Judge Marbley recently became Chief and the Chief Judge position is well suited to handle complex cases such as this matter.  The Chief Judge is afforded additional staff and can, if he chooses, take a reduced case load.  The Desktop for Chief Judges of U.S. District Courts suggest one way a Judge could manage or reduce his caseload is by taking "responsibility for only particular types of cases or matter." *See* Federal Judicial Center, *The Desktop for Chief Judges of U.S. District Courts* 45 (4th ed. 2014).  The Chief Judge is also responsible for determining whether the district will consent to the transfer of a case by the U.S. Judicial Panel on Multidistrict Litigation. *See* 28 U.S.C. § 1407(b).  Thus, Chief Judge Marbley is well positioned to ensure proper and efficient case management of a matter like the instant action, and would have ample time and resources to commit to this matter.

Because Chief Judge Marbley has not presided over an MDL, assigning Chief Judge Marbley this MDL would broaden the pool of jurists with MDL experience, which in itself is a worthwhile goal.  Even more importantly, Chief Judge Marbley has experience adjudicating large scale cases involving numerous plaintiffs, defendants, and a variety of complex claims. *See, e.g., In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751 (S.D. Ohio 2008) ($600 million

---

[21] *See* www.ohsd.uscourts.gov/biomarbley (last viewed November 25, 2019).

securities class action); *see also Feiertag v. DDP Holdings, LLC*, No. 14-CV-2643, 2016 WL 4721208 (S.D. Ohio Sept. 9, 2016) (Fair Labor Standards Act (FLSA) class action); *Graybill v. KSW Oilfield Rental, LLC*, No. 2:15-CV-2462, 2016 WL 2625238 (S.D. Ohio Jan. 28, 2016) (FLSA class action); *Johnson v. Midwest Logistics Sys., Ltd.*, No. 2:11-CV-1061, 2013 WL 2295880 (S.D. Ohio 2013) (Fair Credit Reporting Act class action); *In re AEP ERISA Litig.*, No. 2:03-cv-67, 2009 WL 614951 (S.D. Ohio Mar. 6, 2009) (Employee Retirement Income Security Act class action; certification denied); *Stewart v. Cheek & Zeehandelar, LLP*, 252 F.R.D. 387 (S.D. Ohio 2008) (Fair Debt Collection Practices Act class action); *Castillo v. Morales, Inc.*, 302 F.R.D. 480 (S.D. Ohio 2014) (FLSA class action); *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471 (2004) (Comprehensive Environmental Response, Compensation, and Liability Act and Resource Conservation and Recovery Act class action). Judge Marbley has also handled numerous products liability cases. *See, e.g., Great N. Ins. Co. v. BMW of N. Am. LLC*, No. 2:11-CV-1153, 2015 WL 3936229 (S.D. Ohio June 26, 2015) (auto defect case; jury verdict for defendant); *Davisson v. Ford Motor Co.*, No. 2:13-CV00456, 2014 WL 4377792 (S.D. Ohio Sept. 3, 2014) (auto defect class action case; defendant's motion to dismiss granted); *Delahunt v. Cytodyne Tech.*, 241 F. Supp. 2d 827 (S.D. Ohio 2003) (consumer class action over dietary supplement; defendant's motion to dismiss granted in part and denied in part).

Chief Judge Marbley has a deserved reputation as a thoughtful, deliberate, and dedicated trial judge, and he unquestionably has the intellect and strong case-management skills that an MDL case demands.

Moreover, Chief Judge Marbley appears to have a strong willingness, motivation, and ability to handle the instant complex litigation, as indicated by his decision to take additional cases and designate them as related, and the praiseworthy job his has done advancing the human

trafficking cases in the Southern District of Ohio forward.  Indeed, the work Chief Judge Marbley has performed to advance the ball provides a strong rationale in favor of designating him as the transferee judge.  *See In re Glaceau VitaminWater Marketing and Sales Practices Litigation*, 764 F. Supp. 2d 1349, 1351 (U.S.J.P.M.L. 2011) (The Panel ordered transfer to the Eastern District of New York, where "[t]he court has ruled on a motion to dismiss, and discovery is underway."); *In re Nat'l Arbitration Forum Antitrust Litigation*, 682 F. Supp. 2d 1343, 1346 (U.S.J.P.M.L. 2010) (The District of Minnesota was an appropriate transferee forum because, inter alia, discovery was underway in several actions pending in that district.); *In re Sepracor Inc. Fair Labor Standards Act (FLSA) Litigation*, 629 F. Supp. 2d 1356, 1356 (U.S.J.P.M.L. 2009) (The Panel ordered transfer to the district where "discovery [was] well under way."); *In re Cintas Corp. Overtime Pay Arbitration Litigation*, 444 F. Supp. 2d 1353, 1355 (U.S.J.P.M.L. 2006) (First-filed and most significantly advanced litigation was pending in transferee district); *In re National Sec. Agency Telecommunications Records Litigation*, 444 F. Supp. 2d 1332, 1335 (U.S.J.P.M.L. 2006), subsequent determination, 474 F. Supp. 2d 1355 (U.S.J.P.M.L. 2007) (transferring MDL to jurisdiction with the first-filed and most significantly advanced cases, as well as transferee before judge well-versed in the issues involved); *In re Levaquin Products Liability Litigation*, 560 F. Supp. 2d 1384, 1385 (U.S.J.P.M.L. 2008) (First-filed action, in which discovery had started, was pending in transferee.); *In re Saturn L-Series Timing Chain Products Liability Litigation*, 536 F. Supp. 2d 1367, 1368 (U.S.J.P.M.L. 2008) (Transferee district was site of first-filed case.); *In re Standard Automotive Corp. Retiree Benefits "ERISA" Litigation*, 431 F. Supp. 2d 1357, 1358 (U.S.J.P.M.L. 2006) (Pretrial proceedings were underway in transferee district.).  For the reasons set forth above, Chief Judge Marbley is an excellent judicial candidate for this MDL.

## CONCLUSION

In light of the foregoing, Plaintiffs respectfully request that this Honorable Panel order the Actions and all tag-along actions be consolidated and coordinated for pretrial proceedings before Chief Judge Algenon L. Marbley of the United States District Court for the Southern District Ohio.

Dated: December 9, 2019

Respectfully submitted,

*/s/ Paul J. Pennock*
Paul J. Pennock
**Weitz & Luxenberg, P.C.**
700 Broadway
New York, NY 10003
Tel: (212) 558-5549
Email: ppennock@weitzlux.com

*/s/ Kimberly L. Adams*
Kimberly L. Adams
**Levin, Papantonio, Thomas, Mitchell,
Rafferty & Proctor, PA**
316 S. Baylen Street, Suite No. 600
Pensacola, FL 32502
Tel: (850) 435-705
Email: kadams@levinlaw.com

*/s/ Kimberly A. Dougherty*
Kimberly A. Dougherty
**Andrus Wagstaff, PC**
19 Belmont St.
South Easton, MA 02375
Telephone: (508) 230-2700
E-mail: kim.dougherty@andruswagstaff.com

*Attorneys for Plaintiffs*